# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| RANDY STORK, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 12 C 10310 |
| DENNIS MONTGOMERY, | ) ) | Judge John J. Tharp, Jr. |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, former parolee Randy "Ruven" Stork, filed this civil rights lawsuit against parole agent Dennis Montgomery, alleging, as relevant here, a claim of false arrest under 42 U.S.C. § 1983. Stork alleges that after he attended medical appointments with permission, Montgomery charged Stork with a parole violation and had him taken into custody without reasonable suspicion. Montgomery moves for summary judgment, arguing that, as a matter of law, he had reasonable suspicion to believe Stork violated his parole, or in the alternative, that he had arguable reasonable suspicion and is therefore entitled to qualified immunity. For the reasons set forth below, the motion is granted.

## BACKGROUND

Stork is a registered sex offender residing in Illinois and a former parolee of the Arizona Department of Corrections. Stork served parole for the crime of aggravated criminal sexual assault of a minor that he committed in Arizona. From 2008 to 2011, Stork served his parole in Illinois pursuant to the Interstate Commission of Adult Offender Supervision's Interstate Compact Agreement. Under the terms of the Interstate Compact Agreement, Stork agreed to follow all terms and conditions set by both the Arizona Department of Corrections and the

Illinois Department of Corrections and, further, not to challenge any determination by the State of Illinois or Arizona to return him to Arizona to serve the remainder of his parole. The terms and conditions from the Arizona Department of Corrections that governed Stork's parole were set forth in a document entitled "Conditions of Supervised Release." The terms and conditions from the Illinois Department of Corrections that governed Stork's parole were set forth in Rule 15 of the Parole or Mandatory Supervised Release Instructions ("MSR-15"). A violation of any terms of parole can result in revocation of parole.

The defendant, Illinois parole agent Dennis Montgomery, was assigned to supervise Stork in late November 2010. Before that, Agent Paul Anderson supervised Stork as his parole officer. On or around December 8, 2010, Agent Montgomery conducted a site visit at Stork's residence. During the visit, Stork told Agent Montgomery that he recently injured his knee from a serious fall at work and was on worker's compensation. Also, Agent Montgomery informed Stork during the visit that "[t]he rules for parole for sex offenders remain the same as briefed by your previous agent, Agent Anderson. The only difference or change is your agent."

**A. Terms of Stork's Parole**

Under the Interstate Compact Agreement, Stork was on electronic Global Positioning System ("GPS") monitoring during the period of his parole in Illinois. The Illinois Department of Corrections has a contract with Automated Management System ("AMS") which monitors, records, and documents activities by parolees on electronic monitoring and pages parole agents about problems with parolees. AMS operators interact with parole agents from the Illinois Department of Corrections on a regular basis, and if AMS operators discover information indicating that a parolee has traveled to an unauthorized area, the parolee's agent is notified. Communications between AMS and parole agents are routine. Parole agents rely on AMS when

investigating a parolee's movements that the agent may not have been aware of personally. A sex offender-parolee on electronic GPS monitoring can only obtain authorization for movement from the parole agent or through AMS. During Stork's parole, the GPS system monitoring Stork occasionally registered erroneous "drift points" that made it appear as though Stork was in a location he was not.

As another condition of parole under the Interstate Compact Agreement, Stork was not allowed to possess a cell phone with camera, text messaging, or email capabilities. Stork had asked Agent Anderson for permission to have a phone with camera and text messaging capabilities because there were no phones without any of the restricted capabilities available under Stork's cellular service plan, and Agent Anderson assented. According to Stork, Agent Montgomery knew before December 28, 2010 that he had a cellphone, and Montgomery did not complain that it was a violation of parole terms. Montgomery maintains that Agent Anderson never told Montgomery about any cell phone arrangement before his assignment to supervise Stork. Agents Anderson and Montgomery had only discussed Stork's prior parole violation report for unauthorized movement. Montgomery also maintains that he never saw Stork's cell phone before December 28, 2010 and that he did not know how long Stork had possessed the cellphone.

No sex offender on parole in Illinois may consume alcohol. But, neither Arizona's nor Illinois' parole conditions expressly prohibit the possession of alcohol. Agent Montgomery, however, attested that based on his 14 years of experience as a parole agent who supervises sex offenders, he believes that every sex offender-parolee is briefed at the start of parole that it is a violation of parole to possess alcohol.

**B. December 28, 2010 and Surrounding Events**

On December 20, 2010, an AMS operator was informed by an individual at the Lake County Health Department that Stork had a doctor's appointment scheduled for December 27, 2010 at 8:00 am. The AMS operator granted the request for movement with travel time included. On December 22, 2010, an AMS operator was informed by a caller from Edward Loew's office (Stork's physical therapist) that Stork had an appointment scheduled for December 27, 2010 at 7:00 pm. The AMS operator granted the request for movement with travel time included.

On December 27, 2010, Stork left his residence and arrived at the Lake County Health Department Office at 7:50 am for his 8:00 am appointment and then returned home. Then, shortly before 5:00 pm, Stork contacted AMS and requested his appointment at Edward Loew's office be moved an hour earlier[1] and the request was granted. Stork left his residence and arrived at Edward Loew's office at 7:30 pm for his 8:00 pm appointment and then returned home. On December 28, 2010, Stork attended another physical therapy appointment.

On December 28, 2010, AMS operators notified Agent Montgomery by telephone that Stork had traveled to unauthorized areas on December 26 and 27, 2010, misusing authorized movements. Stork testified that on December 26, 2010, he did not leave his residence.[2]

After receiving this report from AMS, Agent Montgomery came to Stork's residence on December 28, 2010, and immediately yelled at Stork that he "must be the stupidest parolee ever"

---

[1] Presumably the parties intended to say "an hour *later*" given that the new appointment time was 8:00 p.m. For both of Stork's appointments on December 27, 2010, Stork testifies that he drove directly to the appointment office and directly back home. Pl. Add'l SOF, Dkt. #56 ¶¶ 17, 19. Agent Montgomery disputes that Stork drove directly to the office or back home because the GPS data indicates that he did not take a direct route to the office or to his house for either appointment. Def. Resp. to Pl. Add'l SOF, Dkt. #61 ¶¶ 17, 19.

[2] Agent Montgomery disputes that Stork did not leave his residence on December 26, 2010 because AMS notes from December 28, 2010 indicate that that the plaintiff was in unauthorized areas on December 26, 2010. Def. Resp. to Pl. Add'l SOF, Dkt. #61 ¶ 15.

and that he was going back to Arizona because he was misusing his authorized movements. Agent Montgomery was not specific as to where or when he was accusing Stork of misusing his authorized movement. Agent Montgomery then requested Parole Agent Willie Fox to come to Stork's residence as back-up and placed Stork in handcuffs.[3]

After Agent Fox arrived, Agent Montgomery and Agent Fox performed a search of Stork's residence. During the search, Stork's cellphone with camera, email, and text messaging capabilities, was discovered. Two unopened bottles of wine were also discovered. The wine was given to Stork for religious purposes by a charitable Jewish organization for the High Holidays, and Stork testified that he only kept it for sentimental value. Stork was administered a breathalyzer test and a urine screen, and both came back negative for the presence of drugs or alcohol. Agent Montgomery did not arrest Stork on December 28, 2010. After the search, Stork was permitted to leave his residence to obtain medical treatment for his complaints of knee, shoulder, and chest pains. Agent Montgomery relayed the items recovered during the search to AMS to be recorded.

On December 29, 2010, Agent Montgomery requested that AMS review Stork's GPS movements and GPS mapping playback for December 27, 2010. On December 30, 2010, Agent Montgomery completed his violation report and case closure report and recommended that Stork be returned to Arizona. On January 11, 2011, Stork was arrested on a warrant issued based upon

---

[3] After Agent Montgomery entered Stork's residence, Stork testifies that he calmly stated that he was not misusing his movements and that Agent Montgomery pushed him over a chair which caused him to land on the floor and hit his injured knee after he was handcuffed. Agent Montgomery disputes Stork's testimony and testifies that Stork stated "I only went where I was supposed to go and where I was authorized to go" in a loud and aggressive tone. Agent Montgomery testifies that he only placed Stork in handcuffs after Stork jumped from the sofa and aggressively asked "or what are you going to do?" after he advised Stork to lower his voice. Agent Montgomery also denies that he pushed Stork and that Stork was on the ground. The dispute over the force used by Montgomery is not material to the false-arrest claim that is the subject of the pending motion..

Montgomery's parole violation report. On January 18, 2011, a parole violation hearing was conducted, resulting in a finding of probable cause that Stork had violated conditions of his parole. Accordingly, the State of Arizona issued a warrant for Stork's arrest and return to Arizona. Stork's extradition was delayed because he filed a habeas corpus petition in the Circuit Court of Cook County. While the petition was pending, Stork was released from Cook County Jail on September 29, 2011 because his parole term with the State of Arizona had expired.

## ANALYSIS

Summary judgment is appropriate if there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. Material facts are those facts that under the applicable substantive law "might affect the outcome of the suit." *Id*. at 248. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See id*; *JPM Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir. 1996). On a motion for summary judgment, the facts are "viewed in the light most favorable to the nonmoving party," unless those facts are "blatantly contradicted by the record." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### I. False Arrest Claim

Stork's only remaining claim is that he was falsely arrested in violation of his Fourth Amendment rights.[4] A parole agent may be liable for an unreasonable seizure under the Fourth

---

[4] Stork is not challenging the constitutionality of the search that resulted in the discovery of the cell phone and unopened wine, nor does he challenge the due process he received at his

Amendment if he requests an arrest warrant without reasonable suspicion to believe that the plaintiff had violated the conditions of his parole. *Knox v. Smith*, 342 F.3d 651, 657 (7th Cir. 2003). The reasonable suspicion standard requires something less than probable cause but more than a hunch, which exists when there is some objective manifestation that a person is, or is about to be, engaged in prohibited activity. *Id.* at 659 (*citing United States v. Lenoir,* 318 F.3d 725, 729 (7th Cir.2003)). Parolees have a more limited liberty interest than other citizens, justifying this reduced showing. *Knox,* 342 F.3d at 657 (citing *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972). The question of whether an officer had a reasonable suspicion is dependent on a consideration of "the totality of the circumstances and inferences about human behavior." *United States v. Oglesby*, 597 F.3d 891, 894 (7th Cir. 2010) (citing *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005)). The "totality of the circumstances" approach "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Although probable cause and reasonable suspicion are normally mixed questions of law and fact, summary judgment can be appropriate if the determination is based on the plaintiff's version of events. *Knox*, 342 F.3d at 657.

Therefore, the question is whether, when the facts are viewed in the light most favorable to Stork, a jury could reasonably conclude that Montgomery requested the warrant for Stork's January arrest without reasonable suspicion to believe that Stork had violated the terms of his parole. *Knox,* 342 F.3d at 657-58 (*citing Beauchamp v. City of Noblesville, Ind.,* 320 F.3d 733, 742 (7th Cir. 2003)). Montgomery contends that, as a matter of law, he had reasonable suspicion to obtain an arrest warrant because (1) he reasonably believed based on the AMS notification

---

probable-cause hearing (the state-court habeas petition he filed on this issue was mooted by his release).

that Stork had made unauthorized movements; (2) Stork possessed a cell phone with capabilities that violated the terms of his parole; and (3) Stork possessed alcohol in violation of the terms of his parole. Montgomery further contends that he is entitled to qualified immunity.

In response, Stork contends that there are genuine issues of material fact as to whether Montgomery had reasonable suspicion that Stork violated his parole terms, and further that Montgomery "maliciously ignored exculpatory evidence and filed his Violation Report with knowledge thereof." Mem., Dkt. # 45 at 5.

### a. Possession of a Cellphone with Photographic, Internet, and Texting Capabilities

Montgomery contends that he had reasonable suspicion that Stork was in violation of the terms of his parole because Stork unquestionably possessed a cell phone that had capabilities that are not permitted under the terms of his parole. Stork, in response, argues that there is a dispute of fact as to the terms of his parole given his prior agent's oral authorization of the non-conforming cell phone and Montgomery's admission that none of the terms of parole would change because a new parole agent was assigned to the case.

The applicable MSR instructions required the following of Stork:

> You will not own, possess, or use a cellphone, PDA, Blackberry, or any other communication or media device that has Internet capabilities or has any type of photographic capabilities. … No Texting will be allowed on the cellphone.

Parole/MSR Instructions, Plaintiff's Exhibit H at 2, Dkt. #56-8. Stork admits in his Local Rule 56.1(a)(3) Statement of Uncontested Facts that "he is bound by the terms and conditions of the agreements to which he signed, the contents of which speak for themselves," but contends that his previous parole agent, Paul Anderson, knew and assented to Stork possessing a phone with

8

Internet, photographic, and texting capabilities—in other words, a "smart phone."[5] He also contends that Montgomery knew about Stork's cell phone at some point previous to the December 28 search, and therefore, Montgomery could not have had a reasonable suspicion that Stork was violating his parole conditions through his possession of the device.

Stork testified that he received permission from Agent Anderson to have a smart phone, and that would be enough evidence to create a fact issue on that point, even if Montgomery had adduced evidence to refute the claim (he did not). Nevertheless, the question is not whether Stork had permission to have the non-conforming cell phone. The question is whether *Montgomery* knew or should have known that Stork's possession of the phone had been authorized by his predecessor. Even assuming that Stork had permission to have a smart phone, if Montgomery did not know of that modification to Stork's parole conditions, then Montgomery had good reason to suspect that Stork was in violation of the parole conditions once he discovered the phone during the search of Stork's residence.[6]

Montgomery says that he knew nothing about Anderson authorizing a non-conforming cell phone. That fact has not been competently disputed by Stork, who can claim no personal knowledge of what Montgomery knew or did not know. Stork's testimony that Montgomery was aware before December 28, 2010, that Stork had a cell phone[7] falls short of raising a genuine factual dispute because the material information relates to the cell phone's particular features and

---

[5] Stork's testimony is not clear as to the details of the conversation he had with Anderson. *See* Stork Dep., Pl. Ex. A, Dkt. #56-1. at 42,

[6] Stork does not argue that Montgomery is charged with knowledge of the applicable parole conditions, so the Court has no occasion to consider whether a parole officer should be deemed to have constructive knowledge of any relevant modifications to Stork's parole conditions. *Cf. Rabin v. Flynn,* 725 F.3d 628, 633 (7th Cir. 2013) ("a police officer's suspicion of wrongdoing that is premised on a mistake of law cannot justify a *Terry* stop").

[7] As to the cell phone, Stork simply testified, "Well he knows I have one—he didn't have to find one. I mean, he knows I have one." Stork dep., Pl. Ex. A, Dkt. # 56-1 at 155.

Stork's use of them; Stork does not testify (even if he could do so competently) that Montgomery was aware of the cell phone's capabilities, even if he knew about the phone itself.[8] Thus, the possession of the cell phone provided reasonable suspicion that Stork was violating his parole conditions.[9]

### b. Allegedly Unauthorized Movements

Another asserted ground for Stork's arrest for violating his parole is the AMS report of unauthorized movement that Montgomery received on December 28, 2010. On this point, Montgomery argues that the Seventh Circuit's *Knox* decision requires a finding of reasonable suspicion in this case. Stork, on the other hand, argues that there is a genuine issue of fact here because "the movements complained of were authorized and confirmed by AMS and are reflected in the AMS Notes." Mem., Dkt. # 54 at 7.

In *Knox*, an Illinois parolee was released for electronic home detention at the home of his brother. His initial non-compliance with parole rules resulted in a quick violation, after which he was re-released to the host site. More problems ensued, prompting a visit by the parole agent, Smith, and further instructions, including a directive to call every two hours. Knox disputed that

---

[8] And, in any event, Stork does not claim that his prior parole agent gave him permission to *use* the otherwise prohibited features of the phone. Indeed, Stork testified that Agent Anderson said he could keep the phone but instructed him not to "violate it." Stork dep., Pl. Ex. A, Dkt. # 56-1 at 156. Yet the record shows not only that the phone had the banned capabilities, but also that Stork was in fact using the phone for prohibited purposes. For example, the records from his mobile carrier (recovered during the December 28 search) show that the phone was actively used for text messaging despite the express parole term that "no texting" was permitted. *See* Pl. Ex. E, Dkt. # 56-5, at 493 (AMS entry of 12/28/2010 noting discovery at Stork's residence of U.S. Cellular bill reflecting 89 text messages billed from 11/20/2010 to 12/20/10). Montgomery, however, has not raised any argument regarding the unauthorized use of the cell phone, relying solely on Stork's possession of the device; therefore, he has waived this as a basis of his reasonable suspicion.

[9] Moreover, reasonable suspicion is an objective test, and the officer's subjective intent is irrelevant. *United States v. Barnett*, 505 F.3d 637, 639-40 (7th Cir. 2007). Thus Stork's suggestion that Montgomery had a personal grudge against him that caused him to fabricate a basis for his violation report is irrelevant if reasonable suspicion existed as an objective matter.

this visit ever occurred. But on the same day as this disputed visit, AMS made four calls to the host site, none of which yielded a phone appearance by Knox; AMS was told in the morning that Knox was in another part of the duplex, and in the afternoon that Knox's whereabouts were unknown. AMS reported this information to the parole agent, who obtained a warrant. The district court concluded that disputed material facts precluded summary judgment for the agent.

The Seventh Circuit reversed the district court, because regardless of the factual disputes about the interaction between the parole officer and parolee regarding the need to call in every two hours, the parole officer had other reasonable suspicion to believe the plaintiff violated his parole. 342 F.3d at 658. Namely, "[a]n officer in Smith's position could have reasonably concluded upon receiving the AMS call reports that there was reasonable suspicion to believe Knox had left his host site in violation of his MSR." *Id.* at 659. AMS reported that the parolee did not get on the line in any of four telephone calls to the parolee's brother, and on the last call the brother stated that he did not know where Knox was. Upon receiving this information from AMS, the parole agent requested a warrant based on the parolee being AWOL. *Id.* Deeming any other dispute immaterial, the Seventh Circuit summarized the facts that supported reasonable suspicion as follows: "(i) that electronic home detention was a condition of Knox's MSR, (ii) that he was instructed not to leave his host site until hooked up to the system, and (iii) that Smith received information from AMS that Knox's whereabouts were unknown." *Id.* at 659.

Here, too, there is no dispute that Stork was subject to confinement and GPS monitoring, terms of which he was aware, and that the parole agent received information from AMS that Stork had made unauthorized movements. That is sufficient for reasonable suspicion under *Knox*, absent any reason that Montgomery should have concluded the AMS reports to have been in error. Stork unconvincingly attempts to distinguish *Knox* on the basis that in *Knox* the parole

11

officer "immediately" issued a warrant for the parolee because he was AWOL. Mem., Dkt. #54 at 9. In this case, there was a lapse of two days between the AMS reports and the warrant request. Stork therefore argues that because there were listed, authorized movements in the AMS notes that Montgomery should have consulted, the agent must have chosen to recklessly ignore them and rely on only an oral representation from an AMS operator that Stork made unauthorized movements.

But Stork has not supported his argument that the short lapse of time is material to the existence of reasonable suspicion; if there is a constitutional expiration date on a report that a parolee made unauthorized movements, it is more than two days after receipt of the report. Montgomery was not objectively unreasonable in relying on the AMS call two days after the fact. Further, Stork's argument that Montgomery was obligated to use that two-day period to review the AMS files in their entirety to assess whether they supported a violation is a variation on a theme that the Seventh Circuit has rejected repeatedly. "[O]nce probable cause has been established, officials have no constitutional obligation to conduct further investigation in the hopes of uncovering potentially exculpatory evidence." *Matthews v. City of E. St. Louis*, 675 F.3d 703, 707 (7th Cir. 2012). Thus there is no merit to Stork's contention that Montgomery was not entitled to rely on AMS's telephone notification but was instead required to personally review the AMS data before requesting a warrant.

The arguments are largely beside the point in any event, because of the additional information available to Montgomery that Stork ignores. As Montgomery points out (Mem., Dkt. # 60 at 2), that Stork was authorized to go to two specific locations at specific times does not mean that Stork had not otherwise deviated from the allowed course. And the AMS reports in the record, which indeed document the authorizations Stork received, also record several apparent

violations. *See, e.g.*, Pl. Ex. E., Dkt. # 56-5 at 491 (12/28/10 entry noting that on 12/26 Stork "was no where [*sic*] near his work location" and was in Waukegan instead; *id*. at 492 (12/28/10 entry noting that on 12/27 Stork called *after* medical appointment to state he had gone to another site instead). Any of these ostensible violations might be explainable, but on their face, the AMS notes are not exculpatory to the extent they defeat all reasonable suspicion of unauthorized movement. On this record, there is no basis to conclude that it was objectively unreasonable for Agent Montgomery even to suspect that Stork had made unauthorized movements in the days preceding his warrant application.

        C.        **Possession of Alcohol**

Finally, Montgomery argues that there was reasonable suspicion to obtain an arrest warrant for a parole violation based on Stork's possession of alcohol—the two small unopened bottles of wine discovered during the December 28 search. That argument falls short, primarily because it mischaracterizes the conditions of Stork's parole. The MSR-15 did not bar Stork from possessing alcohol; rather, it specifies that Stork was not to *consume* alcohol at any time or possess or consume controlled substances.[10] Likewise, the terms and conditions of Plaintiff's Arizona parole dictated that he was not to possess or consume narcotic drugs or *consume* alcohol. Montgomery skips over these facts entirely in his cursory argument that "possession of alcohol" was a "parole violation" that justified his warrant request. *See* Mem., Dkt. # 48 at 8. He has no evidence for his statement that it was indeed a violation in 2010 for a parolee to possess alcohol. Montgomery's sole factual support is that in his own experience, parolees are always instructed at the outset of their terms not to have alcohol. *See id*. But he admits that he did not personally give Montgomery such an instruction, and he has no direct knowledge that any other

---

[10] Alcohol, and specifically wine, is not a "controlled substance."

parole agent did, so he cannot support his argument that Stork violated some unwritten term of parole. Nor does Montgomery advance or attempt to support the argument that reasonable suspicion could be predicated on a mistaken belief that possession of alcohol was prohibited.

Notably, Montgomery does *not* make the argument that possession of alcohol, though not itself a violation, is circumstantial evidence of "consumption" that nevertheless provided reasonable suspicion of a parole violation. That argument would present a closer question. Most people possess alcohol in order to consume it. Some, of course, may not; they might purchase it as a gift for someone else (or because, as Stork maintains, because they received it as a gift from a religious charity). The question, however, is whether possession of the wine, regardless of the reason, creates a reasonable basis to suspect that Stork may have consumed alcohol. Given that the reasonable suspicion standard is not "more probable than not," and, as noted earlier, does not rise even to the level required for probable cause, it might be possible to conclude that it was reasonable to *suspect* that Stork violated his parole by consuming alcohol when a search of his home yielded two bottles of wine, particularly if there were any other evidence consistent with that suspicion, such as evidence of a recent purchase. But Montgomery argued something different, and offers no additional facts to support a suspicion of consumption, so there is no reason to consider the matter further. Montgomery waived any argument that Stork's possession of the bottles of wine gave rise to a reasonable suspicion that he had violated his parole by consuming alcohol, and the record does not support the assertion that possession itself was barred.

## II. Qualified Immunity

Determining whether a defendant state officer is entitled to qualified immunity requires the Court to inquire (1) whether the facts, taken in the light most favorable to the plaintiff, make

14

out a violation of a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation. *Gibbs v. Lomas*, 755 F.3d 529, 536 (7th Cir. 2014). Because Montgomery had reasonable suspicion based upon the AMS report and the cell phone, he did not request an arrest warrant in violation of Stork's constitutional rights, and he necessarily has qualified immunity for his actions.

*   *   *

For the reasons set forth above, the Court concludes that, as a matter of law, defendant Montgomery has reasonable suspicion to request a warrant to arrest Stork for a parole violation, and therefore, Montgomery's motion for summary judgment is granted.

Date: September 30, 2014

John J. Tharp, Jr.
United States District Judge